FILED IN OPEN COURT

FEB 1 1 2026

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALMOUNT GUNTER<br>a/k/a "Kaz Gunter" and "Omar Gunter"<br>(Counts 1-5),<br><br>TYRA GIDDENS<br>a/k/a "Tyra Gunter" and "Tyra Heath"<br>(Counts 1-3),<br><br>    Defendants. | FILED UNDER SEAL<br><br>Criminal No. 2:26-cr-16<br><br>18 U.S.C. § 371<br>Conspiracy to Commit Theft of<br>Government Property<br>(Count 1)<br><br>18 U.S.C. §§ 641 & 2<br>Theft of Government Property<br>(Count 2)<br><br>18 U.S.C. §§ 1361 & 2<br>Damage to Government Property<br>(Count 3)<br><br>18 U.S.C. § 1343<br>Wire Fraud<br>(Counts 4-5)<br><br>18 U.S.C. § 981(a)(1)(C)<br>Criminal Forfeiture |

**INDICTMENT**
February 2026 Term -- At Norfolk, Virginia

**COUNT ONE**
(Conspiracy to Commit Theft of Government Property)

THE GRAND JURY CHARGES THAT:

  1.  From in or about April 2023, and continuing thereafter until in or about September 2023, in the Eastern District of Virginia, the defendants, ALMOUNT GUNTER and TYRA GIDDENS, did knowingly and willfully conspire and agree, together and with each other, and with other persons known and unknown, to commit offenses against the United States, that is, to embezzle, steal, purloin, or knowingly convert to their use or the use of another any record, voucher, money, or thing of value of the United States or an agency thereof, in violation of Title

18, United States Code, Section 641.

## OBJECT OF THE CONSPIRACY

2.   It was the object of the conspiracy that the defendants would obtain funds to which they were not entitled by recycling stolen materials belonging to the United States Navy, namely by stealing cables, and hardware, from Naval Station Norfolk, that contained valuable metals and materials which they would recycle for a monetary return.

## MANNER AND MEANS

3.   Defendant, Almount Gunter (GUNTER), worked as a civilian contractor aboard Naval Station Norfolk, located in the Eastern District of Virginia. GUNTER's job gave him civilian credentials for the military installation, and access to the secured Navy Facilities (NAVFAC) supply yard.

4.   As part of the conspiracy, GUNTER used his access to the supply yard aboard Naval Station Norfolk after normal working hours. The supply yard contained large spools of a variety of valuable cables and hardware, the cables were primarily high voltage power cables used to supply power to Naval vessels while they were docked. The core of these cables contained metals, such as copper and aluminum, that could be recycled for profit.

5.   The high voltage power cables become irreparable if they were cut in the incorrect manner. GUNTER used a battery powered cutting tool to remove lengths of cable that could be transported in the back of a vehicle.

6.   In furtherance of the conspiracy, defendant Tyra Giddens (GIDDENS) and GUNTER, recycled the stolen material at Bee Green Recycling in Richmond, Virginia, and elsewhere. GUNTER would transport the material to the recycling business, and the receipts were issued to GIDDENS.

## OVERT ACTS

7. In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Virginia, and elsewhere:

   a. From in or about May 2023, through in or about September 2023, GIDDENS, recycled over 48,000 pounds of materials, including ship to shore high voltage power cables, at Bee Green Recycling in Richmond, Virginia.

   b. From in or about May 2023, through in or about September 2023, GIDDENS, received over $117,000 in payments from Bee Green Recycling of Richmond, Virginia.

   c. On or about September 1, 2023, GIDDENS, solicited a known conspirator to help GUNTER remove cables from Naval Station Norfolk that evening.

   d. On or about September 1, 2023, GUNTER used his work credentials to gain access after-hours to Naval Station Norfolk, and his key to access the Naval Facilities supply yard.

   e. On or about September 1, 2023, GUNTER, and another known person, used battery powered cutting tools to cut and remove high voltage cable from Naval Facilities supply yard on Naval Station Norfolk.

(In violation of Title 18, United States Code, Sections 371.)

## COUNT TWO
(Theft of Government Property)

8. Preceding allegations and statements contained in the entirety of this indictment are realleged and incorporated as if set forth fully herein.

9. On or about September 1, 2023, in the Eastern District of Virginia, the defendants, ALMOUNT GUNTER and TYRA GIDDENS, did, willfully and knowingly steal and purloin high voltage cables and hardware, the property of the United States Navy, of a value exceeding $1,000.00, and aided and abetted the same.

(In violation of Title 18, United States Code, Sections 641 and 2.)

## COUNT THREE
(Damage to Government Property)

10. Preceding allegations and statements contained in the entirety of this indictment are realleged and incorporated as if set forth fully herein.

11. On or about September 1, 2023, in the Eastern District of Virginia, the defendants, ALMOUNT GUNTER and TYRA GIDDENS, did, willfully and by means of unlawfully and inappropriately cutting high voltage cables, injure and commit a depredation against the property of the United States and the United States Navy, specifically, destroying four spools of high voltage cables, and the resulting damage was of a value exceeding $1,000.00, and aided and abetted the same.

(In violation of Title 18, United States Code, Sections 1361 and 2.)

## COUNTS FOUR-SIX
(Wire Fraud)

12. From at least in or around May 2020, and continuing through at least in or around August 2021, in the Eastern District of Virginia and elsewhere, ALMOUNT GUNTER, the defendant, having devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did, transmit and cause to be transmitted by means of wire, radio, and television communication, in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the execution of such scheme and artifice, which scheme and artifice, and the execution thereof, operated in substance as follows:

### PPP Program

13. In response to the economic crisis caused by the novel coronavirus pandemic, in or around March 2020, Congress made government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program ("PPP"). The purpose of loans issued under the PPP was to enable small businesses suffering from the economic downturn to continue to pay salary or wages to their employees. Eligible businesses seeking a loan under the PPP could apply for such a loan through a federally insured depository institution. To qualify for a loan under the PPP, an applicant had to meet certain criteria, including, among other things, that it was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on an IRS Form 1099-MISC. Moreover, the amount of the loan that could be approved under the PPP and implementing regulations typically was a function of the applicant's historical payroll costs.

14. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, mortgage interest

payments (but not mortgage prepayments or principal payments), rent payments, utility payments, interest payments on debt obligations that were incurred before February 15, 2020, or for refinancing certain specified SBA loans.

15. "First Round" PPP loans were accepted by a variety of companies that acted as "servicers." The "servicer" would receive the initial application from an applicant and process the administration of the loan on behalf of the lender. After a loan was funded, the servicers sent an electronic transmission of the loan package to the Small Business Administration (SBA) server in Sterling, Virginia.

16. Second round or "second draw" PPP loans were made available by 2021. Among other things, second draw PPP loans required showing continued payment of payroll to employees. For loans over $150,000, applicants were required to show a decline in quarterly revenue from 2019 to 2020 of at least 25%. For second round PPP loans, application packages were sent by servicers to SBA servers located in Oregon for verification and population of an SBA loan number.

17. Recipients of PPP loans could later apply for loan forgiveness, which would forgive the entire loan balance upon a showing by the borrower of appropriate use of the PPP funds. Loans not forgiven were subject to repayment. The SBA guaranteed 100% of the outstanding loan balance, and that guarantee was backed by the full faith and credit of the United States.

18. Paypal, Inc. (Paypal), as a servicer of "first round" PPP loans, accepted and facilitated loans through their subsidiary Swift Capital. Servers used by Swift Capital, and the processing of "first round" loan applications submitted through Paypal, were located in San Jose, California.

19. Prestamos CDFI, LLC (Prestamos), as a servicer and lender of "second round" PPP loans, submitted PPP loan applications electronically to the SBA, whose servers were located in Oregon. Oregon based servers performed an initial loan application review, thereafter,

electronically transmitting the loan details to an SBA server located in Sterling, Virginia, for assignment of an SBA loan number. Once an SBA loan number is assigned, the loan package was transmitted from servers in Virginia back to the servicer to process the loan for funding.

### The Scheme and Artifice to Defraud

20. The purpose of the scheme and artifice to defraud was for GUNTER to obtain monies through loans to which he was not entitled, by knowingly and willfully making materially false and fraudulent statements for the purpose of obtaining said monies through Paycheck Protection Program (PPP) loans and from the United States Small Business Administration that funded the forgiveness of said loans, by the fraudulent representation of his entitlement to receive Paycheck Protection Program loans. The PPP benefits were authorized, transported, transmitted, transferred, disbursed, or paid in connection with a presidentially declared major disaster or emergency. In furtherance of the scheme and artifice to defraud, GUNTER, while being located in the Eastern District of Virginia, did:

21. On or about May 8, 2020, submit an initial application for a first round PPP loan, through Paypal, for his alleged sole proprietorship "Almount Gunter's Cook and Catering." GUNTER alleged that it was not a home-based business and consisted of four (4) employees, having been in operation since January 1, 2020. GUNTER alleged an average monthly payroll of $6,500 and requested a loan amount of $16,250.

22. On or about May 9, 2020, submit a second application for a first round PPP loan, through Paypal, for his alleged sole proprietorship "Almount Gunter's Cook and Catering." GUNTER alleged that it was not a home-based business and consisted of four (4) employees, having been in operation since January 1, 2020. GUNTER alleged an average monthly payroll of $7,000 and requested a loan amount of $17,500.

23. On or about May 9, 2020, submit a third application for a first round PPP loan, through Paypal, for his alleged sole proprietorship "Almount Gunter's Cook and Catering." GUNTER alleged that it was not a home-based business and consisted of four (4) employees, having been in operation since April 1, 2017. GUNTER alleged an average monthly payroll of $4,720 and requested a loan amount of $11,800.

24. On or about May 11, 2020, submit a signed PPP loan application form, a PPP loan note, and a PPP loan agreement, for a loan in the amount of $11,800. GUNTER provided earning statements for four employees, including himself, that showed his year-to-date earnings as of December 27, 2019, totaling $1,840.

25. On or about May 12, 2020, submit a fourth application for a first round PPP loan, through Paypal, for his alleged sole proprietorship "Almount Gunter's Cook and Catering" for the amount $15,560. GUNTER provided an earnings statement for himself, that showed his year-to-date earnings as of December 31, 2019, totaling over $60,000.

26. On or about May 20, 2020, submit a fifth application for a first round PPP loan, through Paypal, for an alleged sole proprietorship "Ajay Top Car Wash." GUNTER alleged that the business had a monthly payroll of $3,000, and requested a PPP loan of $7,500.

27. On or about January 7, 2021, GUNTER incorporated "Almount Gunter's Cooking and Catering" as a Limited Liability Company (LLC) with the Virginia State Corporation Commission.

28. On or about January 19, 2021, submit an initial application for a second round PPP loan, through Paypal, for his alleged sole proprietorship "Almount Gunter's Cook and Catering."

29. On or about February 21, 2021, submit a second application for a second round PPP loan, through Prestamos, for his alleged sole proprietorship "Almount Gunter's Cook and

Catering". GUNTER alleged that his sole proprietorship had one (1) employee, with a monthly average payroll of $4,500 and a requested loan amount of $23,018.

30. On or about March 13, 2021, submit a signed PPP loan application form, for a loan in the amount of $23,018.

31. On or about April 5, 2021, submit a signed PPP loan note, for a loan in the amount of $23,018 (loan x8700.)

32. On July 28, 2021, submitted a PPP loan forgiveness application for his second round PPP loan (loan x8700) for the amount of $23,018.

33. GUNTER provided fraudulent supporting documentation for his alleged sole proprietorship "Almount Gunter's Cooking and Catering" to meet the eligibility criteria to receive a PPP Loan, specifically the required tax document, a 2019 1040-C "Profit or Loss from Business" (1040-C) showing pre-pandemic revenue, wherein, GUNTER submitted at least three different 2019 1040-C forms in application for First and Second Round PPP loans, including:

   a. On or about May 11, 2020, a 1040-C showing gross sales of $2,090, wages of $0, total expenses $6,481, and net loss of $4,391;

   b. On or about May 12, 2020, a 1040-C showing gross sales of $65,063, wages of $0, total expenses $8,415 and net profit of $56,648;

   c. On or about January 19, 2021, a 1040-C showing gross sales of $78,921, wages of $0, total expenses $24,198 and net profit of $78,921.

Execution of the Scheme

34. On or about the dates noted in the Counts set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the aforesaid scheme and artifice, ALMOUNT GUNTER, the defendant, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce certain

writings, signs, signals, pictures, and sounds, that is electronic submissions of Paycheck Protection loan documents and the resulting wire transmissions, as noted below:

| Count | On or about | Description of Wire |
|---|---|---|
| 4 | May 11, 2020 | GUNTER electronically submitted a signed First Round Paycheck Protection Program Borrower Application Form, resulting in a loan of $11,800 (loan x7409), a wire transmission from Virginia to California. |
| 5 | March 13, 2021 | GUNTER electronically submitted a signed Second Round Paycheck Protection Program Borrower Application Form, resulting in a loan of $23,018 (loan x8700), causing a wire transmission from Oregon to Sterling, Virginia, in the Eastern District of Virginia. |

(In violation of Title 18, United States Code, Section 1343.)

## CRIMINAL FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

    A.    The defendants, upon conviction of the offenses charged in Counts One, Two, Three, Four, and Five, of this Indictment, as part of the sentencing of the defendant pursuant to Fed.R.Crim.P. 32.2, shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

    B.    If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(All pursuant to Title 18, United States Code, Section 981(a)(1)(C); and Title 21, United States Code, Section 853(p).)

*United States v. ALMOUNT GUNTER, et al.*
Criminal No. 2:26-cr-16

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

A TRUE BILL:

REDACTED COPY

_____
FOREPERSON

Todd W. Blanche
Deputy Attorney General

By: _____
Jeremy Mckinnon
California Bar No. 336424
Special Assistant United States Attorney
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Office: 757.441.3040
Fax: 757.441.6689
E-mail: jeremy.mckinnon@usdoj.gov

12